Good morning, Your Honors. May it please the Court, I just want to confirm I have observed five bills in my firm that I have not reviewed. The issue in this case, Your Honors, is whether the board of contract appeals for the Department of the Interior have been properly determined by the terms of the federal timber contract that issued here, clearly and unambiguously demonstrated that Thomas Creek and not the BLM had the risk of loss to the timber prior to the award of that contract. As the language in the contract states, however, Thomas Creek accepted the timber based on its condition as of Thomas Creek's inspection of the timber, not as of the date of the award of the contract. Because this inspection occurs before contract award, as was urged by the BLM in its instructions to the bidders, at a minimum, the contract does not clearly and unambiguously indicate that Thomas Creek had the risk of loss to the timber prior to the award of the contract. There's no disagreement that there was no enforceable contract prior to 1995, correct? Correct, Your Honor. The issue there is the scope of the risk of loss clause in the contract that was entered into in 1995. If there had been some improvement in the volume or quality of the lumber between 1991 and 1995, would you all have felt that you have to compensate, give that, return that money to the government? No, Your Honor, we're not, because there's no provision in the clause in the contract for that. The reason that we're focusing on, the contract does, though, however, have a risk of loss clause. And even though I don't believe it's in the record, because this issue was not actually put before the board of the hearing, because it was not raised by the parties, there's no discernible growth in the timber during this period. This timber was quite old, so we're not talking any substantial gain in volume in the timber during that time period. However, one of the important aspects of this case is that because neither the BLM nor Thomas Creek even raised this issue, both parties will only be working under the operation that there was a risk of loss. That issue is not addressed in the board hearing. There's no evidence presented on it. However, have you given the opportunity to show that there is no risk of gain in the timber during that period? What about Section 6, warranty of fitness of the timber? There is none, no warranty. No warranty as to the quality or quantity. Address that? Yes, that's 6B, Your Honor. And if you read that clause carefully, what it refers to, what it states is that the timber is accepted as is with no warranty. And if you look immediately above that in Clause 6A, Clause 6A says the timber is accepted by the purchaser based on its examination of that timber and its opinion of the value thereof. So that acceptance as is is an acceptance based on the purchaser's prior inspection of the timber, which then uses to set up its bid. But you inspected it in 1995, right before you signed the contract, right? I did, Your Honor, but that would then be changing the original terms of the contract, which the rescissions act said you should not do. The way the contract works is that you explain in the appendix. Well, you just told me there was no enforceable contract between 1995. So you're saying we've changed the terms of a contract that wasn't in effect. No, I'm sorry. What I'm stating, Your Honor, is that the rescissions act states that you are not to change the terms of the contract. The contract was entered into in 1995. But that contract that was entered into in 1995 specifically states that the bidder is accepting the timber based on the value of the timber at the time the bidder inspected the timber to set up its bid price. That bid price was put in in 1991. That bid price could not be changed, could not be lowered or raised, nor could any other term of the contract be changed in 1995. So at the time the contract was entered into in 1995, that risk of loss clause based on the language in the contract states that if there's a loss of a timber between when you, Thomas Creek, prepared your bid and committed to your bid prices, which they did in 1991, and as a reward, we will bear that risk as the BLM because we have the risk of loss. And where does it say that? I mean, where are you getting that? Well, I'm getting that, Your Honor, from section 7, the risk of loss clause. But that's also explained in appendix 435 how that process works under the contract. So you're saying as is, the as is language in the contract was as is as of 1991 when we prepared our bid? Yes, Your Honor, because if you look at section 6A above it, it specifically says that we are accepting and executing the contract on the basis of our examination and inspection of the timber sold under this contract in our opinion for the value thereof. If the BLM intended for us to accept it as is, as of the date of award, section 6A would not be in the contract. BLM broke this contract. Why? I mean, I'm not seeing what in 6A is problematic here for the government. And you examined it and inspected it in 1995 before you signed the contract. And it was sold under this contract only in 1995, not in 1991. So I'm having a hard time seeing why 6A is problematic. Well, it's because in our view, Your Honor, 6A states that refers to the inspection that we conducted to prepare our bid. Because in the bidder's instruction, it says to go out and inspect the timber to prepare your bid. That inspection occurred in 1991. We could not change that bid price. Under the Decisions Act, we're bound by the terms of the contract. Our bid price, which went into 1991, was locked in. Well, but you could walk away from the deal. You could have walked away from the deal. We certainly could have. But we did not think we needed to because we had this clause in the contract that allowed us to reduce the cost. Another point I want to point out is that this is not a claim against the government for any kind of liability. We're simply asking that section 7 of the contract be put into effect as the BLM routinely did. And as the evidence in this case, specifically Appendix 203 and Appendix 435 shows, the BLM recognized this exact same interpretation. This was their understanding of how the contract clauses apply. Section 7 applies to—they recognize that your bid price locks you in to the value that you assessed at the time you prepared your bid. Because the BLM has a title to consider. If there's a loss up until when you cut that timber from that time you prepared your bid, they will then deduct that value from your overall bid price. It's not a claim against the government. We're asking that the clause be implemented as written and as both parties clearly understood it to work. So, Your Honor, going back to your point, when we signed this contract in 1995, that was our understanding of how the contract would work. So not understanding that there was a change in the value, we recognized that we would then be allowed to deduct from the contract price any change that occurred. We will pay for what we get. But because of the way the contract's written and because of the way the BLM has understood the contract, both parties understood the contract, that's how it worked. Now, the BLM's expression of its understanding of the contract didn't occur contemporaneously with the execution, right? It occurred later? Well, that's one of the problems, because we have no evidence of that, Your Honor, specifically because the BLM never took this position. They accepted all along that they had this risk of loss. Well, when you say they accepted it, I mean, they accepted it by not contesting your assertion made at the time that you said, well, we will be filing a claim. But they didn't respond to that. But it was also a matter of their prior contract interpretation. But how do we know that? We don't. That's the problem we have. But you didn't put in any evidence that that had been a long course, or you didn't attempt to put in evidence that that had been a long course of interpretation by BLM? I mean, you're saying to us now that it was. Correct. What's the basis for that? Well, Your Honor, the problem is we did not put any specific evidence in on that because the BLM, throughout the course of this appeal, the contract officers sat on, never took the position that they took any other position. They always agreed that that was how they interpreted the clause. The contracting officer's decision makes very clear that they understood this is how we interpret this clause. When we went into the Board of Contract Appeals room, they never changed that position. The issue was not there's no contract in place. We don't have liability. They recognized liability. The issue was how much. They entered a decision, and then you filed for reconsideration of that decision, as I understand it, and they ultimately came out with another opinion. Did you, at the point of the reconsideration motion, present anything to the Board of Contract Appeals suggesting that their take was inconsistent with a longstanding interpretation by BLM? Not just in this particular case, but in other cases as well. I can find that reason. I'm pretty sure we also pointed out, Your Honor, that the problem we had was we did not have any direct lien evidence on that point because of the position the BLM took. If you will, it was a surprise to everyone that BLM included. The BLM did not change their position in this case as to whether or not they were liable until after the Board issued its second decision. Then they said, well, we agree with that now. But throughout the course of this proceeding, from day one, they took the position that they were liable. It wasn't a matter of liability. It was just quantum. It was just quantum. It was just quantum. Yes, Your Honor. For that reason, we were disadvantaged in not being able to present evidence to rebut the position that there was no liability. They clearly had taken the position there was. So that was one of the disadvantages we had in this case in the way it proceeded. You want to reserve your rebuttal time, Mr. Carter? I do, Your Honor. Thank you. Mr. Blades. May it please the Court. As the Court has discussed, there was no contract prior to 1995. And the risk of loss provision on which Thomas Creek relies in the contract does not say anything about covering losses prior to the entrance of a contract. And as the Court has also focused on, there are the disclaimers in Section 6 that say that the timber is being sold as is without any warranty of merchantability, quantity, quality. But the as is, it depends on what we mean by as is. As is of as of when? There's no reasonable interpretation other than as of the execution of the contract. Now, is it true that BLM has consistently construed – this is obviously foreign language. Has BLM prior to this case consistently taken the position that as is means as of the time of the inspection? Not that I'm aware of. Are you aware of a contrary position taken by BLM, or is it just that you're not aware of what BLM's position has been historically? What I'm aware of, and I will point this out to the Court in this particular case and perhaps some others that are similar in the sense that they were affected by the Rescission Act. When you read the letters of the contracting officer in this case, he seems to be overly influenced by the fact that the Rescission Act said, I have to give you this contract and I have to make adjustments. The contracting officer seemed to think that the Rescission Act required him to make some adjustments. Beyond that, which I think was a misapplication, a misunderstanding of the Rescission Act, I don't believe BLM has ever taken a contrary position and said that the risk of loss provision covers anything prior to the contract, covers anything between bid and contract. I would point out that there's usually a space of time. It's not terribly lengthy, but it may be 30, 60 minutes. Has this issue ever been litigated before? Not that I'm aware of. All right, so this is really the first time out of that. I mean, there's the old Court of Claims case. What is it? Wesco or something? Webco. Webco. But that involved, I take it, an issue of warranty, right? This is a little different. This is timing of inspection as is. Right. But the essence of it, there are two perspectives that I think might be useful in terms of the essence of Thomas Creek's claim. One is that the whole disclaimer of warranty doesn't really apply because there's a risk of loss provision. That is that if anything happens between bid, and there may be a space, as I was about to say, there may be 30, 60, 90, even longer period where contractors are allowed to go out, look at the timber, and then there's a date for submitting their bid. Right. They're not all going to go out and look on the same day. No. It seems unreasonable to think that somehow the day that a contractor decides to go out and look at the timber is the day that starts the warning of a risk of loss provision in a contract that hasn't even been entered into that deals with selling timber as is, which it doesn't say as it was or as of the date of your inspection. But 6A does say that the purchaser warrants that this contract is accepted and executed on the basis of this examination. Is that meaningless? No. And we're talking about, I mean, do you agree then that you're talking about the examination and inspection of the timber that occurred prior to the bid? Yes, ma'am. And it says that the contract is accepted. And then the next paragraph says the timber is sold as is. In other words, it's simply telling the contractors that you can bid on this contract, you don't have to go look at the timber, but we want you to agree that you are taking this contract based on your own assessment of what the value of the timber is because we, the government, we are not placing a value on that timber. The second perspective that I mentioned before, I said there were two. The second one that I think might be useful is in essence what Thomas Creek is saying is that although there's all this disclaimer in the contract about how the government estimates quantity, but that's not the basis for your bid. The basis for your bid is going to have to be your estimate. And the government is not warranting merchantability, quantity, quality, fitness for any purpose. We're just putting the timber out there and asking you how much you want to pay for it. What would happen if, on your view of your construction of sections six and seven, if there were a similar arrangement, an inspection by the purchaser, let's say, a month before the execution of the contract and everything's fine, and then the day before the contract is executed, a fire burns up three quarters of the timber, but the parties are unaware of it at the time they actually sign the papers. They sign the papers. Is that just too bad for the purchaser? No, sir. I don't think so. And to a certain extent, the parties dealt with that kind of situation. In this case, there wasn't a fire. And I would say I think there needs to be a recognition that a catastrophic event of some sort that makes performance impossible is something that in different contexts would often result in a decision of the contractor. If the object to be sold no longer exists, unbeknownst to the parties when they actually sign the contract for sale, I don't know offhand, but I don't think that the buyer still requires them to pay. Well, I guess I understand that. Certainly, maybe in a dramatic effect, in his mind, that would be so. I guess what I'm really trying to get at is what the, in this context, as is, given the fact that, I mean, if I buy a used car from you, presumably before I sign the check over to you, I'm going to take one last look at the car, and if you've just had an accident and the whole rear end of the car is bashed in, I'm probably either going to insist on a reduction of the price or I'm not going to go through with the deal. In this situation, it seems to me much more likely, and here it apparently happened, that there's going to be some uncertainty as to the state of affairs between the time of the inspection that you refer to and the time of the actual execution of the contract. But you say that, notwithstanding that absence, something dramatic that would lead to a possible rescission, that the risk of loss during that interim period falls on the would-be purchaser. Yes, sir. Now, I think any risk of loss would be very de minimis, absent some catastrophic event. I mean, to the extent you've got a debt tree that's still merchantable that you don't want to cut down, it's going to deteriorate by the day. But you know that when you take a look at it. As I was going to mention before, in terms of other things happening, the parties did deal with that. In the record, one of the letters from the contracting officer discusses the fact that apparently, in between the time when the sale had been canceled and the time when they had to offer again, that the government had sold, legitimately sold, some of the timber that was originally included in the sale. So they deducted that out and said, OK, that's not there anymore because we already sold it. Do you think they were obliged to do that? I'm sorry? Do you think they were legally obliged to do that? I don't think it comes under the Section 7 risk of loss. What does it come under? I'm not sure. I mean, they were being nice, but were they obliged to be nice? To me, that's an important question because if, in fact, they could have just said, drop dead. As is means as of the date of the contract. You get nothing. I think it goes back to what you mentioned before in the fire situation. That's why I brought these up. This isn't a fire situation. It's not quite dramatic. I think it's useful to go through the exercise that if we're required to give the sale because Congress has told us to, but we know that some of what was originally part of the sale is just not there anymore. It's impossible for us to give that timber to you now, that then it is appropriate. And I would say that I hadn't thought about this beforehand, so I can't cite you what the law is. But I think under the common law, perhaps it comes under the realm of impossibility. If 90% of the timber is still there, but 10% is gone because we actually sold it to somebody else. So you don't really mean as is means as is. It means as is as long as as is is pretty much what as was. No, I think as is means as is of the day of the sale of the contract. Yeah, except that if some of it of what was asserted to be as is is less than as was, then you're going to make a payment under some circumstances, and you're going to feel obliged to do so. I think it's impossible for us to deliver as is in terms of what was promised. You're delivering as is because you just took some off the property, and the as is of the time of the signing of the contract is minus the stuff you took off. Well, I think it's in terms of your example of the sale of the car, and that is that as is, if at the time of the contract it actually has been damaged, then either there's going to be no sale, which was an option for Thomas Creek here, or the sale may take into account the fact that it has actually been damaged since the letter. But other than that, the car is still sold as is. In other words, if it's got 120,000 miles on it, it's got 120,000 miles on it. And if the engine dies in a week, even though the plaintiff expected it, had it looked at by his mechanic, and thought it was good for another three or four years, that's not something that's covered by some risk of loss provision. Well, here's my problem, and I see where you're going, and I appreciate the analysis, but let me go to the car case. This is what troubles me about the government's position in this case. If I go over to your house to buy the used car, and I look at the car, I give it a very close look, and I say, fine, I'll take it as is, and we have a contract that says this car is sold as is, and we go into the house, and we sit down at your kitchen table, and we execute the contract, and I get out my checkbook, and I get ready to write your check, and before I actually sign that check, your wife goes out and takes the tires off the car. It seems to me you can't then come into court and say, well, he said as is, as of the time of the execution of the contract, and by the time of the execution of the contract, the tires are gone, therefore he bought the car without tires. You wouldn't make that argument, I take it, would you? No. Why isn't that sort of this case? Because, I mean, you didn't go in and take the, at least with respect to this part of the dispute, you didn't take the property, you didn't reduce the value of the property, but the net effect is the same, which is the value of the property was reduced, and your argument is that as is is as of the time the ink is dry. Well, I think the net effect is not that the value of the property was reduced by the sale, by the... No, no, it wasn't your act, but... It's interesting that the clause in 7 addresses this in the context of the fire example. It says, provided, however, if the loss results from a fire that was not caused by the purchaser, his contractors, then the risk of loss should be borne by the party holding title. Who's that? This is the fire. This is apparently Judge Bryson's fire example, right? Yes, sir. And it's the same clause we're looking at. Who's the one holding title? That's you, isn't it? Yes, I think so. So you would, in that instance, if they didn't cause the fire and the fire happened, you're going to let them off the hook. I think you said that anyway. Yes, sir. I believe that that is the intention. But it's interesting to go on to the next clause. Risk of loss to the government shall not exceed the value of such timber computed at the prices. But you're not going to pay them for their truck if it happened to be caught in the fire, too. No, we're not going to pay them some imaginary or a different price, some market price that's gone up or something like that. And that perhaps leads us into the point I was going to make before about the Tennessee is basically saying that despite the fact that all of the warranties and everything as to the government's estimates and the quality, quantity, and species of timber were disclaimed and don't count, that somehow its estimate, when it went out and took a look at the area in order to formulate its bid, is warranted somehow. And that now, because they didn't actually get what they thought they might get when they took a look at it, and they want to rely on their inspection and say, well, the government's inspection is not warranted, but our inspection is warranted, and if we don't get what our inspection should have, we should have gotten, then the government has to pay for it. And that's not what the Comeback is all about at all. Basically, it's just we've got this area of timber, we want to sell it, this is what we think is in it, you take a look at it, you see what you think is in it so that you can offer us your bid, and then we're going to sell it to you. We're going to sell it to you as is. In addition to Clause 6, Clause 7 made reference to Exhibit B. Exhibit B is on page 181 of the appendix. It's where the rooted prices for the different species are found, and in its introductory language at the top, it talks about how the purchaser will be liable for the full contract price regardless of the quantity and quality of the timber that can be found and actually cut. Could I ask you one other just factual question? At page 145 through 146 of the appendix, there's something that's designated Settlement Agreement, and I was just curious, what is that all about? Because it looks like you all have settled the case, and obviously that is not so. So maybe you can explain what that is in the context. As mentioned in our brief, the claim at issue here was filed at the same time as another claim. Oh, this is a wholly different claim? This is the other claim. OK. End of inquiry. Thank you. Thank you. We've got it. Mr. Blades, thank you. Mr. Garden, you have five minutes. Your Honor, one of the things I want to point out is that the contract at a minimum does not show that it's clear that Thomas Creek had his liability because of the explicit language in section 6A. And that is directly contrary to the board's analysis that the contract was clear, and therefore no reference or use of the party's conduct is relevant to the witnesses. As I think we've shown in our brief, one, the contract at a minimum is not clear. We, in fact, think it's clear that there are lots of risks on the DLM. But at a minimum, it's not clear that it's on us because of 6A. In that situation, as the rules of conduct verification make clear, the party's conduct becomes very important. Now, we don't have, as Your Honor pointed out, good evidence in the record right now about prior, previous conduct part of this contract. But what's interesting is we do have evidence for this dispute, during this contract, of the bailiff's conduct, which is directly contrary to the position now. And that's the appendix page that I pointed out. I would make the proposition, Your Honor, that if the party's conduct during contract performance is inconsistent with their current dispute position, it's even more compelling that they understood that that was the intent of the contract. I mean, it's clear from their conduct and all these other prior situations with the firewood and with the other incidents where they recognized that Section 7 applied. And the firewood loss occurred prior to contract award. That if the BLM has taken that position during contract administration, that's even more compelling evidence that that's the intent of the parties. And that certainly was our intent expressed to them. And we believe the evidence, even under the limited ability we have to present the evidence, shows that that is also the intent of the parties. What was the cause of the loss again? We referred to it as firewood. Your Honor, there was a... Some people went out on a sailor mate and took firewood off their sail. And that was one of the causes. And that, just to make sure the record is clear, that might be what page 145 of the appendix is involving. I was not involved in that situation. But that's a different claim altogether, so it doesn't... All right. The other point I wanted to make is that... The government pointed out that it was unreasonable to rely upon the inspection date as the date upon when the risk of loss started. But that runs directly contrary to Section 6a. If the government felt that the risk of loss period started with the award, they never would have, much less should have, included the language in 6a that's in the contract. That language is directly contrary to the position the government is now taking, which is that the risk of loss starts on the award date. So I think when the government claims that it's somehow too arbitrary to rely upon when the contractor inspected it to make that the start of the risk of loss, that's not correct. It's inconsistent with the contract language. It also is perfectly appropriate, because that's when the contractor says their bid price. You set your bid price based on that inspection, and then if there's a loss, a proven loss, which is a part of the knowledge of perjury, between the time you inspect and the time you get it, we'll just deduct that loss from your bid price. So that makes perfectly logical sense. It's not simply a dangerous precedent. It makes perfect sense, and it's also very consistent with contract terms. The other point, Your Honor, is that the government also pointed out the same situations, I think I mentioned before, very similar situations where the prior loss occurred prior to award, and the government may agree that Section 7 required them to reduce the contract price. Contrary to the government's position, I think there's no distinction as to what kind of loss. So those losses are the exact kind of situation we're talking about here. In the present claim, we're talking about a loss of tenure. It's not that it's gone through deterioration. That's no different than it being gone through somebody taking it on or through some other method of a fight that they've rendered not merciful. So there really is no distinction, no valid distinction the government can make between the losses which demonstrably did occur in this case where they used Section 7 and the loss that's at issue in the present claim. You are, I take it, nobody is contesting the $50,000 in change that's already been paid? Correct, Your Honor. The government's not come back after you for that, right? Correct, Your Honor. In your honor, that's all I have in this hearing. Thank you, Mr. Gordon. Thank you. All rise. The defendant will adjourn for the day today.